IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT KNOXVILLE
Assigned on Briefs August 26, 2020

**STATE OF TENNESSEE v. RICKY ALLEN DAVIS**

**Appeal from the Criminal Court for Knox County**
**No. 107989    Bobby R. McGee, Judge**

————————————————————

**No. E2019-01819-CCA-R3-CD**

————————————————————

The Appellant, Ricky Allen Davis, was convicted in the Knox County Criminal Court of first degree premediated murder and unlawful possession of a firearm and received concurrent sentences of life and eight years, respectively.  On appeal, the Appellant contends that the evidence is insufficient to support the convictions and that the trial court committed plain error by admitting a witness's hearsay statement into evidence, by allowing a witness to testify that she saw the Appellant with a gun prior to the shooting when there was no evidence that it was the same gun used in the shooting, and by allowing a witness to testify that low-income people often shared cellular telephones and did not help the police due to fear of retribution.  Based upon the record and the parties' briefs, we affirm the judgments of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgments of the Criminal Court Affirmed**

NORMA MCGEE OGLE, J., delivered the opinion of the court, in which JOHN EVERETT WILLIAMS, P.J., and ALAN E. GLENN, J., joined.

Joshua D. Hedrick (on appeal), Knoxville, Tennessee, and Rhonda Lee (at trial), Powell, Tennessee, for the appellant, Ricky Allen Davis.

Herbert H. Slatery III, Attorney General and Reporter; Katherine C. Redding, Assistant Attorney General; Charme P. Allen, District Attorney General; and Hector Sanchez, Assistant District Attorney General, for the appellee, State of Tennessee.

**OPINION**

**I.  Factual Background**

In May 2016, the Knox County Grand Jury indicted the Appellant for the first degree premediated murder of John Kyle and unlawful possession of a firearm.  At trial, Shanique

McDowell acknowledged that she was testifying under subpoena and "[did] not want to be here today." In January 2016, the Appellant was in a relationship with Ms. McDowell's aunt and lived with Ms. McDowell's aunt. At the time of trial, Ms. McDowell had known the Appellant for five to ten years.

Ms. McDowell testified that on January 4, 2016, she went to a movie. When she got out of the movie, she learned the victim had been shot. Ms. McDowell had seen the Appellant at Ms. McDowell's mother's house in East Knoxville earlier that day. Ms. McDowell said her mother's house was five or six minutes from the crime scene, "depending on if you're walking or driving."

Ms. McDowell testified that on the morning of January 5, 2016, she spoke with the Appellant on the telephone. The Appellant told Ms. McDowell that he shot the victim because the victim owed him money for pills. He also told her that he intended to shoot the victim and that he tried to shoot the victim in the head. Later that day, police officers transported Ms. McDowell to the Knoxville Police Department (KPD). Ms. McDowell viewed a photograph array and selected the Appellant's photograph. The police asked Ms. McDowell to write down the conversation she had with the Appellant that morning, and Ms. McDowell read her written statement to the jury as follows: "Ricky called me at 7:00 today and said he shot John-John in the chest because he owed him money, and he said he ran after he did it."

Ms. McDowell testified that "everyone" in East Knoxville "usually [had] a gun" and that she saw the Appellant holding a gun on January 4. A "guy" was with the Appellant, and Ms. McDowell did not know if the gun belonged to the Appellant or the man with him. Ms. McDowell said she was not afraid of the Appellant.

On cross-examination, defense counsel asked if Ms. McDowell liked the Appellant, and Ms. McDowell answered,

> I mean, I don't hate anyone, but what I'm saying is, he's done a lot to my family, you know what I'm saying? And my aunt or whatever, and, like, you know, just the things they go through. No, I don't like some of the things he has put her through. So, I mean, I don't. Yeah, I don't like some of the things he's done.

Ms. McDowell acknowledged that she and the Appellant were not friends. She said that she knew the victim's family and that a few of her friends were members of the victim's family. However, Ms. McDowell did "not really" know the victim.

Ms. McDowell testified that East Knoxville was a dangerous area and that "everyone had a gun" for protection. After the movie on January 4, Ms. McDowell learned on Facebook that the victim had been shot. Ms. McDowell described herself as a "gossip girl." She said someone named "Shay" told her that the Appellant shot the victim. Ms. McDowell then told others what Shay said. That night, Ms. McDowell telephoned her aunt, but her aunt did not answer. The next morning, Ms. McDowell's aunt returned Ms. McDowell's call. Ms. McDowell acknowledged that the Appellant "got on the phone" and confessed to killing the victim. Defense counsel asked why the Appellant would confess to Ms. McDowell, and Ms. McDowell responded, "I don't know. I don't know why[.]" Defense counsel asked if Ms. McDowell had any reason to get the Appellant in "trouble." Ms. McDowell said that she "wouldn't do nothing crazy" but that she did not think the Appellant and her aunt should be together. Ms. McDowell acknowledged telling the police that "it was best" for the Appellant to go to jail.

Ms. McDowell testified that at the time of the shooting, she did not think the Appellant had a telephone. Ms. McDowell acknowledged telling the police that the Appellant and her aunt shared a telephone. Ms. McDowell said she saw the Appellant with a black gun "a day or two" before the shooting.

On redirect examination, Ms. McDowell testified that after the shooting, everyone on the "streets" was saying that the Appellant shot the victim. Ms. McDowell acknowledged that she did not call the police after the Appellant's confession and that people who spoke with the police were not regarded "fondly" in her neighborhood.

Dwight Harris testified that on January 4, 2016, he went to the home of his cousin, Darrisha Nelson, at 2621 Wilson Avenue. The victim was "a close friend of the family," and the victim was at Ms. Nelson's house "quite often." Mr. Harris said that as he pulled up to Ms. Nelson's house, the victim was leaving. The victim was talking on his cellular telephone, and they spoke briefly.

Mr. Harris testified that the victim walked toward the street while Mr. Harris knocked on Ms. Nelson's front door. Mr. Harris noticed the victim talking to someone, and they appeared to be having a "casual conversation." Mr. Harris stated, "And the next thing you know, I heard shots." Mr. Harris "jumped" onto the porch. He heard the victim call his name, so he "rushed" to help the victim. The victim got up off the ground and leaned on Mr. Harris's truck, and Mr. Harris drove the victim to St. Mary's Hospital. During the drive, the victim told Mr. Harris to "run" red lights and said he was dying. Mr. Harris never saw the victim with a gun.

On cross-examination, Mr. Harris testified that the drive to the hospital took seven to eight minutes. The victim was not unconscious during the drive. Mr. Harris asked the victim who shot him, but the victim responded, "Get me to the hospital."

Michael Mays testified that he was the custodian of records for Knox County's Emergency Communications District E-911. Mr. Mays identified a "disc" containing a recorded call on January 4, 2016, and the State played the recording for the jury. During the call, which was placed at 2:58 p.m., Mr. Harris reported that the victim had been shot at 2621 Wilson Avenue and that he was driving the victim to St. Mary's. The dispatcher asked if the victim knew who shot him, and Mr. Harris answered, "I don't know. He's not really conscious right now." The dispatcher asked if the shooting was a "drive by," and Mr. Harris told the dispatcher that he pulled up to his cousin's house and that "a guy shot." On the recording, the victim could be heard telling Mr. Harris to "hurry up," and Mr. Harris could be heard telling the victim, "Stay with me, cuz" and "You ain't dying."

Darrisha Nelson testified that she knew the victim for more than twenty years. On January 4, 2016, the victim was shot in front of her home at 2621 Wilson Avenue. Ms. Nelson was not home at the time of the shooting, but three surveillance cameras outside her home captured the incident.

The State played the recordings for the jury. The recordings showed Ms. Nelson's front porch, Wilson Avenue from the right side of Ms. Nelson's house, and Ms. Nelson's driveway. The victim's red Jaguar was backed into the driveway. Mr. Harris's red pickup truck pulled into the driveway and parked beside the Jaguar. The victim got out of the Jaguar and left the driver's door open while Mr. Harris got out of the pickup. Both of them were talking on cellular telephones. The victim walked toward the right on Wilson Avenue while Harris walked onto Ms. Nelson's front porch. A person approached the victim, and the victim and the person talked and walked together to the Jaguar. Mr. Harris, who was still talking on his cellular telephone, stood on the porch. A second person walking on the opposite side of Wilson Avenue came into view. The person talking with the victim suddenly shot the victim, and Mr. Harris dove onto the porch. The victim fell onto the ground by his car, and the shooter ran in the direction from which the shooter and the victim had come. The person across the street ran in the same direction as the shooter. The shooter appeared to drop something in the middle of Wilson Avenue. The shooter stopped and ran back to the item. The shooter picked up the item, appeared to fire more gunshots toward the victim, and continued running. The victim stood up and leaned against his car, and Mr. Harris ran to the victim. The victim walked around the back of Mr. Harris's pickup and got into the truck's passenger side while Mr. Harris got into the driver's side. Mr. Harris backed his truck out of the driveway, almost hitting a car traveling on Wilson Avenue, and drove away.

- 4 -

Officer Edward Johnson of the KPD testified that he found five shell casings of the same caliber at the scene. Blood was on the victim's car, which was consistent with the victim's touching the car after the shooting. Officer Johnson went to St. Mary's Hospital and collected the victim's gold-colored necklace, gold-colored ring, and clothes. Officer Johnson also collected $91.83 that had been on the victim's person. On cross-examination, Officer Johnson testified that he could not determine whether all of the shell casings were fired from the same gun.

Stephanie Ogle testified that she was the Office Supervisor and the keeper of records for Knox County Criminal Court. Ms. Ogle identified a certified judgment, showing that the Appellant was convicted of aggravated assault with a deadly weapon in 2006.

Roy Dobbins acknowledged that he was serving a prison sentence at the time of the Appellant's trial, that he was testifying under subpoena, and that the State had not made a "deal" with him in exchange for his testimony. Mr. Dobbins testified that he and the Appellant grew up together in the Lonsdale community. In 2016, Mr. Dobbins and the Appellant were being housed in the Knox County Jail and "caught up with each other." Mr. Dobbins said the Appellant told him about the victim and "all the stuff that went down with that." Mr. Dobbins said the Appellant claimed that the shooting was the second time he and the victim had "problems" and that the shooting was related to "higher up . . . in the organization." The Appellant also claimed that "the first time didn't go through right" but that "the second time, . . . he smoked [the victim's] ass." Mr. Dobbins understood the Appellant to mean that the Appellant shot and killed the victim. Mr. Dobbins acknowledged that the Appellant seemed proud about what he had done and said that the Appellant "sound[ed] . . . like he had enough nuts to do it."

On cross-examination, Mr. Dobbins acknowledged that he had prior convictions of aggravated robbery, robbery, aggravated assault, evading arrest, reckless endangerment, and filing false reports and that he had a trial coming up in about four months. He said that although he was in prison, he was taking college classes. Mr. Dobbins stated that he used to be a member of the Arian Nation, that he "held rank" in the organization, and that people looked up to him. He said, though, that he was no longer a gang member and that he had "covered" his tattoos. He said the victim was a member of the Crips gang.

Mr. Dobbins testified that when he and the Appellant were growing up, they had an "on and off" friendship. He explained, "We be cool, we'll get into it, we'll be cool. . . . He's kicked my ass before. I've kicked his ass before. We've eat together. You know, . . . we broke bread together." Mr. Dobbins said he provided information about the shooting to the State in hopes that he would receive "favoritism" from the district attorney. However, the district attorney did not help him, and he went to prison. Mr. Dobbins acknowledged that he was still hoping to receive some "favoritism" for his upcoming trial.

Investigator Terry Pate of the KPD's Organized Crime Unit testified that he went to St. Mary's Hospital on January 4, 2016, in response to a radio call that someone had been shot and was being transported in a vehicle to the hospital. When Mr. Harris's truck pulled up to the hospital, the victim's feet were "hanging out the passenger-side window." Mr. Harris got out of the truck, and Investigator Pate went to the passenger side. The victim was lying on the seat and was "coming in and out" of consciousness. Investigator Pate asked the victim "who did that to him." The victim asked the officer to help him get out of the truck, so Investigator Pate helped the victim get out of the vehicle. The victim's cellular telephone was in the truck and either was ringing or was receiving text messages. On cross-examination, Investigator Pate acknowledged that the victim did not say who shot him.

Shannon Morris testified that she was a civilian forensic examiner for the Internet Crimes Against Children Task Force and that she had forensic training in electronic devices, including cellular telephones. Ms. Morris performed a "phone dump" of text messages from the victim's cellular telephone, meaning that she extracted the telephone's incoming and outgoing text messages. Starting at 2:48 p.m. on January 4, 2016, the victim's telephone sent messages to and received messages from a telephone with the number xxx-xxx-4177. Those messages were as follows:

Sent at 2:38:39 p.m.:       Who this

Received at 2:39:04 p.m.:   Wya[1]

Sent at 2:39:16 p.m.:       Who is this

Received at 2:39:36 p.m.:   U kno who dis is Jon jon

Received at 2:40:19 p.m.:   ???

Sent at 2:40:34 p.m.:       No I dont who

Received at 2:41:05 p.m.:   Where u at then call me boo

Sent at 2:41:38 p.m.:       If I didn't i wood not have asked u now who is this

Received at 2:42:25 p.m.:   Boy Wya n quit playin

_____

[1]Ms. Morris testified that "Wya" was "lingo" for "where you at."

- 6 -

| | |
|---|---|
| Sent at 2:42:51 p.m.: | U just lost me bye |
| Received at 2:43:41 p.m.: | [N*gga] dis rula n u bn dodgin me dude u lied at da u call n I'm on ya ass asap |
| Sent at 2:46:58 p.m.: | Cuz u keep actn like u want to see me talkn bout what u goin do tome rs it's whatever if that's how u want it and [n*gga] and if it was not for me [n*gga] vic wanted u off the hood but u no what I got u hold |
| Sent at 2:48:47 p.m.: | Na cuz im goin show u why im og u playin im done with this [sh*t] |
| Received at 2:49:28 p.m.: | Look [n*gga] I told u my situation n u playin me like a hoe so b careful wat u say |
| Sent at 2:50:20 p.m.: | Im done with it |
| Received at 2:50:47 p.m.: | Aiight |
| Sent at 2:54:09 p.m.: | Get at vic |

Darinka Mileusnic-Polchan, the Chief Medical Examiner for Knox County, testified as an expert in forensic pathology that she participated in the victim's autopsy and prepared his autopsy report. The victim sustained three gunshot wounds. One bullet entered the victim's abdomen and exited his back. The bullet "extensively destroyed" his liver, "affected" his vena cava and pancreas, and "clip[ped]" his second lumbar vertebra, which may have explained why he immediately fell to the ground after the shooting. The second bullet entered and exited the victim's right thigh. The third bullet penetrated the victim's left palm, and Dr. Mileusnic-Polchan recovered the bullet from his palm. She acknowledged that the victim's ability to survive the gunshot wound to his abdomen would have been "low."

Dr. Mileusnic-Polchan testified that the victim weighed about one hundred sixty pounds and was about five feet, nine inches tall. The bullet that entered the victim's abdomen followed a "relatively straight line," indicating that he and the shooter may have been about the same height. Dr. Mileusnic-Polchan found gunpowder residue on the victim's red shirt and on his pants, meaning that he and the shooter were close to each other at the time of the shooting. She also was able to determine that "another set of bullets or

another phase of shooting happened" while the victim was on the ground.   She concluded that the victim's cause of death was multiple gunshot wounds and that his manner of death was homicide.

On cross-examination, Dr. Mileusnic-Polchan clarified that she could "tell by looking at the video" that the victim and the shooter appeared to be about the same height. However, she could not determine from the victim's wounds whether the victim and the shooter actually were the same height.

Investigator Michael Washam of the KPD's Violent Crime Unit testified that he investigated the victim's death.  On January 4, 2016, Investigator Washam responded to 2621 Wilson Avenue.  The victim's Jaguar, which Investigator Washam later learned was owned by the victim's aunt, was backed into the driveway.  Investigator Washam saw bullet casings, and the homeowner gave three surveillance videos to the police. Investigator Washam said that in one of the videos, the shooter appeared "slightly shorter and heavier" than the victim.  The video showed that the victim and the shooter had a conversation, that the victim put his hands up, and that the shooter fired three shots at the victim.  The shooter ran but appeared to drop something.  The shooter returned to the item, picked it up, and fired two more shots toward the victim.  Investigator Washam noted that the shooter's shoes had "distinctive white markings."  Another person appeared in the area of the shooting and ran "about the same time" as the shooter.

Investigator Washam testified that the victim was transported from St. Mary's Hospital to the University of Tennessee Medical Center but died in surgery.  The next day, "several people" gave the police information about Ms. McDowell.  Officers went to Ms. McDowell's home and transported her to the police department.  Investigator Washam said that Ms. McDowell was not uncooperative but that she "was not happy about having to write the statement out."  Later that day, the police charged the Appellant with first degree murder.  The Appellant turned himself in to the police on January 26, 2016.

Investigator Washam testified that during his investigation, he learned that the Appellant had a Facebook page named "Rulagang Disway."  Investigator Washam looked at the page and saw pictures of the Appellant with "associates."  Investigator Washam said the page "clear[ly]" belonged to the Appellant.  Investigator Washam learned from the victim's cellular telephone that the victim had been exchanging text messages with someone named "Rula" on January 4.  The messages began at 2:35 p.m. and ended at 2:54 p.m., which was two to three minutes before the shooting.  The telephone number that sent the messages to the victim's telephone was registered to someone named "Michael Fowler."  Mr. Fowler lived in Murfreesboro, and Investigator Washam was never able to contact him.  However, Investigator Washam determined that Mr. Fowler's relatives lived "almost across the street" from where the Appellant lived in East Knoxville at the time of

the shooting. Specifically, Mr. Fowler's relatives lived at 2645 Lay Avenue, and the Appellant lived at 2606 Lay Avenue. Lay Avenue was near the scene of the shooting. Investigator Washam said it was "[v]ery normal" for people of lower socioeconomic status to share cellular telephones. He also said it was generally "very difficult" to get people of lower socioeconomic status to provide the police with information about crimes, explaining that "the outlook is that they're ratting or they're doing something that's going to get -- put them in disfavor."

Investigator Washam testified that during his investigation, he learned that Mr. Dobbins wanted to talk with him about an unrelated homicide. Investigator Washam met with Mr. Dobbins, and the victim's case "came up" during their conversation. Investigator Washam told Mr. Dobbins that the police would "try to go to bat for him," and Investigator Washam spoke with the assistant district attorney about Mr. Dobbins. However, the district attorney's office did not want to help Mr. Dobbins, so Mr. Dobbins "went to jail." After the Appellant turned himself in to the police, Investigator Washam spoke with him. The Appellant did not give Investigator Washam any information about the shooting.

On cross-examination, Investigator Washam testified that although the police found a shoeprint when they were tracking the shooter, they were unable to confirm the shoeprint was related to this case. Investigator Washam said that based on his investigation, he thought the Appellant sent the text messages to the victim. An investigator spoke with Mr. Fowler's relatives. Mr. Fowler's relatives said Mr. Fowler "used to live here," but they did not know anything about the shooting. Investigator Washam acknowledged that the Appellant waived his rights and spoke with the police. Investigator Washam said, though, that the Appellant "basically had more questions for us than he had any answers."

Corporal Eric Wyrick testified that he was the Intake Supervisor for the Knox County Sheriff's Office. At some point, the district attorney's office requested photographs of the shoes the Appellant was wearing when he turned himself in to the police on January 26. Corporal Wyrick provided the photographs to the district attorney's office. He also identified the shoes at trial.

At the conclusion of Corporal Wyrick's testimony, the State rested its case. The Appellant did not present any proof, and the jury convicted him as charged of first degree premediated murder and unlawful possession of a weapon, a Class C felony. The trial court immediately sentenced him to life for the murder conviction. After a sentencing hearing, the trial court sentenced him as a Range II, multiple offender to eight years for unlawful possession of a weapon and ordered that he serve the sentences concurrently.

## II. Analysis

A. Sufficiency of the Evidence

The Appellant claims that the evidence is insufficient to support the convictions because the only evidence against him was the testimony of Ms. McDowell and Mr. Dobbins, who both had motives to help the State. The Appellant also contends that the evidence is insufficient because the text messages did not actually connect him to the victim. The State argues that the evidence is sufficient. We agree with the State.

When an appellant challenges the sufficiency of the convicting evidence, the general standard of review by an appellate court is "whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." Jackson v. Virginia, 443 U.S. 307, 319 (1979); Tenn. R. App. P. 13(e). The State is entitled to the strongest legitimate view of the evidence and all reasonable or legitimate inferences which may be drawn therefrom. State v. Cabbage, 571 S.W.2d 832, 835 (Tenn. 1978). Questions concerning the credibility of witnesses and the weight and value to be afforded the evidence, as well as all factual issues raised by the evidence, are resolved by the trier of fact. State v. Bland, 958 S.W.2d 651, 659 (Tenn. 1997). Because a jury conviction removes the presumption of innocence with which a defendant is initially cloaked at trial and replaces it on appeal with one of guilt, a convicted defendant has the burden of demonstrating to this court that the evidence is insufficient. State v. Tuggle, 639 S.W.2d 913, 914 (Tenn. 1982).

A guilty verdict can be based upon direct evidence, circumstantial evidence, or a combination of direct and circumstantial evidence. State v. Hall, 976 S.W.2d 121, 140 (Tenn. 1998). "The [trier of fact] decides the weight to be given to circumstantial evidence, and '[t]he inferences to be drawn from such evidence, and the extent to which the circumstances are consistent with guilt and inconsistent with innocence, are questions primarily for the [trier of fact].'" State v. Rice, 184 S.W.3d 646, 662 (Tenn. 2006) (quoting Marable v. State, 313 S.W.2d 451, 457 (Tenn. 1958)). "The standard of review 'is the same whether the conviction is based upon direct or circumstantial evidence.'" State v. Dorantes, 331 S.W.3d 370, 379 (Tenn. 2011) (quoting State v. Hanson, 279 S.W.3d 265, 275 (Tenn. 2009)).

First degree murder is the premeditated and intentional killing of another person. Tenn. Code Ann. § 39-13-202(a)(1). A premeditated killing is one "done after the exercise of reflection and judgment." Tenn. Code Ann. § 39-13-202(d). The element of premeditation is a question of fact for the jury. State v. Davidson, 121 S.W.3d 600, 614 (Tenn. 2003). Although the jury may not engage in speculation, it may infer premeditation from the manner and circumstances surrounding the killing. Bland, 958 S.W.2d at 660. At the time of the offenses, Tennessee Code Annotated section 39-17-1307(b)(1)(A) (2016) provided that it was unlawful for a person to possess a firearm if the person "[h]ad been

- 10 -

convicted of a felony involving the use or attempted use of force, violence, or a deadly weapon[.]" Unlawful possession of a firearm was a Class C felony. Tenn. Code Ann. § 39-17-1307(b)(2) (2016).

Taken in the light most favorable to the State, the evidence shows that at 2:38 p.m. on January 4, 2016, the victim began exchanging text messages with someone named "Rula." In the messages, Rula accused the victim of lying and "dodgin me." Rula also told the victim that Rula was "on ya ass asap." Just four minutes later, Mr. Harris called 911 and reported the shooting. During Investigator Washam's investigation, he discovered that the Appellant had a Facebook page named Rulagang Disway. Investigator Washam also linked -4177, the telephone number that sent the threatening messages, to the Appellant. Finally, Ms. McDowell and Mr. Dobbins testified that the Appellant confessed to them that he shot the victim. Although Ms. McDowell testified that she did not like the Appellant and wanted him to go to jail and although Mr. Dobbins gave the police information about the shooting in hopes of gaining help for his own legal problems, questions concerning the credibility of the witnesses, the weight and value to be given the evidence, as well as all factual issues raised by the evidence are resolved by the trier of fact, not this court. State v. Tuttle, 914 S.W.2d 926, 932 (Tenn. Crim. App. 1995). The jury, as the trier of fact, was in the best position to assess the credibility of the witnesses. Odom, 928 S.W.2d at 23. Accordingly, the evidence is sufficient to support the convictions.

## B. Plain Error

The Appellant claims that the trial court committed plain error by (1) admitting Ms. McDowell's written statement into evidence because the statement was hearsay, (2) allowing Ms. McDowell to testify that she saw the Appellant with a gun prior to the shooting when there was no evidence that it was the same gun used in the shooting, and (3) allowing Investigator Washam to testify that low-income people often shared cellular telephones and did not help the police due to fear of retribution. The State contends that the Appellant has waived the issue regarding Ms. McDowell's testimony about the gun because he failed to address that issue in his appellate brief and that he is not entitled to plain error relief on the remaining issues. We agree with the State.

The Appellant did not object to the testimony of Ms. McDowell or Investigator Washam at trial. Therefore, the issues are waived. See Tenn. R. App. P. 36(a) (nothing in the rule shall be construed as requiring relief be granted to a party responsible for an error or who failed to take whatever action was reasonably available to prevent or nullify the harmful effect of an error). At the hearing on the motion for new trial, the Appellant argued that the trial court should review the issues for plain error. See State v. Vance, 596 S.W.3d 229, 253 (Tenn. 2020) (stating that "[t]he clear implication of [Tennessee Rule of

- 11 -

Evidence] 103(d) is that evidentiary objections not brought to the trial court's attention at the appropriate time will not be considered under plenary review"). The trial court found that given the testimony of Ms. McDowell and Mr. Dobbins, who both stated that the Appellant confessed to shooting the victim, any error did not rise to the level of plain error.

We may consider an issue as plain error when all five of the following factors are met:

> (a) the record must clearly establish what occurred in the trial court; (b) a clear and unequivocal rule of law must have been breached; (c) a substantial right of the accused must have been adversely affected; (d) the accused did not waive the issue for tactical reasons; and (e) consideration of the error is "necessary to do substantial justice."

State v. Adkisson, 899 S.W.2d 626, 641-42 (Tenn. Crim. App. 1994) (footnotes omitted); see also Tenn. R. App. P. 36(b). Furthermore, the ""plain error" must be of such a great magnitude that it probably changed the outcome of the trial.'" Id. at 642 (quoting United States v. Kerley, 838 F.2d 932, 937 (7th Cir. 1988)). It is the appellant's burden to demonstrate plain error. State v. Gomez, 239 S.W.3d 722, 727 (Tenn. 2007). We do not need to consider all five factors if we determine that a single factor does not warrant relief. State v. Smith, 24, S.W.3d 274, 283 (Tenn. 2000).

1. Ms. McDowell's Prior Statement

First, the Appellant contends that it was plain error for the trial court to admit Ms. McDowell's written statement into evidence as an exhibit. The Appellant asserts that the statement was "textbook" hearsay and that no exceptions to the hearsay rule allowed the statement to be admitted. The State argues that no unequivocal rule of law was breached because, in the absence of an objection by the Appellant, the statement was admissible as substantive evidence and because the Appellant has not shown that consideration of the error is necessary to do substantial justice. We agree with the State.

Ms. McDowell testified that on the morning after the shooting, the Appellant told her that he shot the victim because the victim owed him money for pills. He also told her that he intended to shoot the victim and that he tried to shoot the victim in the head. Later that day, the police asked Ms. McDowell to write down the conversation she had with the Appellant. The State showed Ms. McDowell her written statement and had her read the statement to the jury.

Hearsay is defined as "a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter

- 12 -

asserted." Tenn. R. Evid. 801(c). Generally, hearsay is inadmissible. See Tenn. R. Evid. 802. However, when hearsay evidence is admitted without objection "'it is . . . rightly to be considered as evidence in the case and is to be given such weight as the jury think[s] proper.'" State v. Smith, 24 S.W.3d 274, 280 (Tenn. 2000) (quoting State v. Bennett, 549 S.W.2d 949, 950 (Tenn. 1977)).

We agree with the State that the Appellant cannot demonstrate that a clear and unequivocal rule of law was breached. Although Ms. McDowell's prior statement was hearsay, "'[a] party may consent to the admissibility of evidence which is otherwise prohibited by the Rules, so long as the proceedings are not rendered so fundamentally unfair as to violate due process of law.'" State v. Tedarrius Lebron Myles, No. E2016-01478-CCA-R3-CD, 2017 WL 2954690, at *6 (Tenn. Crim. App. at Knoxville, July 11, 2017) (quoting Smith, 24 S.W.3d at 279). Therefore, "[w]hile the evidence was certainly subject to exclusion or to a limiting instruction, no rule of law required it to be excluded if the parties consented to its admissibility." Id. In this case, the defense did not object to the admissibility of the statement, and we do not think that the admission of the statement rendered the proceedings so fundamentally unfair as to violate the Appellant's right to due process, particularly since Ms. McDowell herself testified about the Appellant's confession. Therefore, no clear and unequivocal rule of law was breached.

We also agree with the State that consideration of the error is not necessary to do substantial justice. As noted by the State, Ms. McDowell's prior statement was cumulative to her testimony about her conversation with the Appellant. Moreover, during defense counsel's cross-examination of Ms. McDowell, defense counsel established that Ms. McDowell did not like the Appellant and that she had a motive to lie about his confessing to the shooting. Therefore, we conclude that the Appellant is not entitled to plain error relief.

2. Ms. McDowell's Testimony About a Gun

Next, the Appellant contends that it was plain error for the trial court to allow Ms. McDowell to testify that she saw the Appellant with a black handgun one or two days before the shooting because there was no evidence that it was the same gun used to shoot the victim. However, as the State noted in its brief, while the Appellant included this issue in the "ISSUES PPRESENTED FOR REVIEW" section of his brief, he did not address the issue in the "ARGUMENT" section of his brief. Therefore, the issue has been waived. See Tenn. R. App. P. 27(a)(7) (providing that an appellate brief must contain an argument "setting forth the contentions of the appellant with respect to the issues presented, and the reasons therefor, including the reasons why the contentions require appellate relief, with citations to the authorities and appropriate references to the record (which may be quoted verbatim) relied on."); Tenn. Ct. Crim. App. R. 10(b) ("Issues which are not supported by

argument, citation to authorities, or appropriate references to the record will be treated as waived in this court.")

3. Investigator Washam's Testimony

Finally, the Appellant claims that it was plain error for the trial court to allow Investigator Washam to testify that people in low-income communities shared cellular telephones and did not want to help the police. The Appellant contends that the evidence was irrelevant and was prohibited by Tennessee Rule of Evidence 602. The State argues that the Appellant is not entitled to plain error relief. Again, we agree with the State.

On direct examination, Investigator Washam testified that the text messages to the victim were sent from a telephone number registered to Mr. Fowler. Investigator Washam also testified that Mr. Fowler's relatives lived near the Appellant on Lay Avenue in East Knoxville. The following exchange then occurred.

> Q. Okay. Let me ask you something. In the course of your careers -- multiple careers, is it uncommon for people in lower socio economic status-type neighborhoods and such to kind of share phones?
>
> A. Yes. Very normal that we will run into that. And, again, depending on what they do for a living, it may be even more so if they're -- if they're involved in something illegal, potentially, going to use even more phones, burn phones, whatever you want to refer to it as. People will go through phones. They owe money for something, hey, use my phone up, a lot of prepaid phones. So they got $20 worth of phone calls on there, or ten minutes, whatever it might be, that's not unusual at all.
>
> Q. Okay. So a minute phone, is that -- is that the same thing?
>
> A. Yeah, minute phone.
>
> Q. You're paying for the actual minutes?
>
> A. Yes.
>
> Q. For law enforcement, is that harder than somebody who has a monthly commitment or a monthly plan, is it harder to track --
>
> A. Absolutely.

Q. Okay.

A. Because one of the things we'll do -- and that's what I did in this case -- is I went into Accura, which is a public database, there's a -- TLO is another one -- and ran the number. And that's how I came back with Mr. Fowler, and then did some research on him. And it will usually tell us, also, who their service is, whether it be Sprint or whoever it might be.

And it makes it easier when they've got a contract, because that number stayed consistent. It's not unusual to run a phone that we call a minute phone or a burn phone and it have ten different people that's had it over a year period of time, if they're even listed. Sometimes they won't even be listed.

. . . .

Q. Okay. And, sir, let me talk to you about just your investigations generally as it relates to homicide. How many of your homicides would you say occur in Knox County -- or East Knox County?

A. Well, we had 34 last year. And I would think that probably a good half of those occurred in East Knoxville.

Q. Okay. And based on your training and experience in investigating these homicides, what has been your experience regarding witnesses coming forward on homicides or any other type of offense?

A. It is very difficult. And I say that throughout the city, short west Knoxville's the same way. It's not unusual that we'll know there were 20 people out there and we have nobody that wants to talk to us, nobody wan- - - I mean, the current climate is such that, obviously, nobody wants to be portrayed as, quote, cooperating with the police in certain areas. Now, that's not always true. It depends -- and we do have some good citizens in both those areas that are low economic that come forward and talk to us. But in general, it's very difficult, because the outlook is that they're ratting or they're doing something that's going to get -- put them in disfavor.

Q. And just generally, the acceptability of doing that and living in an area such as short west or east Knox County, is that what would be completely unacceptable in those areas?

- 15 -

A.  Well, it's difficult at best.  It really is.  It's difficult for the person to do that and live there and not take some kind of heat or, you know, some retribution for it.

Relevant evidence is "evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence."  Tenn. R. Evid. 401.  "All relevant evidence is admissible except as [otherwise] provided. . . . Evidence which is not relevant is not admissible."  However, even relevant evidence "may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence."  Tenn. R. Evid. 403.

Tennessee Rule of Evidence 602 provides that "[a] witness may not testify to a matter unless evidence is introduced sufficient to support a finding that the witness has personal knowledge of the matter.  Evidence to prove personal knowledge may, but need not, consist of the witness's own testimony."  Essentially, this Rule "provides that a witness is not competent to testify unless he perceived the facts through one or more of the five senses."  State v. Boling, 840 S.W.2d 944, 949 (Tenn. Crim. App. 1992).  As this court has explained,

> In determining whether a witness is competent for purposes of Rule 602, the trial court must determine whether a witness had a sufficient opportunity to perceive the subject matter about which he or she is testifying.  Thus, the party offering the testimony must introduce sufficient evidence to support a jury finding that the witness had personal knowledge of the matter.
>
> While the rule fails to define what constitutes "knowledge," the rule does not require "absolute certainty."  Nevertheless, the witness/declarant's statement may not be based on mere speculation.

State v. Land, 34 S.W.3d 516, 529 (Tenn. Crim. App. 2000) (quoting Neil P. Cohen et al., Tennessee Law of Evidence, § 602.4, p. 313-14 (3rd ed. 1995)).

Turning to the relevance of the testimony, the State's theory was that the Appellant's nickname was Rula and that Rula sent the threatening texts to the victim just before the shooting.  However, the telephone number from which the texts were sent was registered to Mr. Fowler in Murfreesboro.  Therefore, Investigator Washam's explanation for how the Appellant may have obtained the telephone and sent the text messages to the victim was relevant to the State's case.  Furthermore, defense counsel insinuated through her cross-examination of Ms. McDowell that Ms. McDowell was not credible because Ms.

- 16 -

McDowell did not immediately report the Appellant's confession to the police. Therefore, we conclude that Investigator Washam's testimony that people in low-income communities often did not cooperate with the police due to fear of retribution also was relevant. We note that Ms. McDowell acknowledged on redirect-examination that she did not call the police after the Appellant's confession because people who spoke with the police were not regarded "fondly" in her neighborhood.

Turning to Investigator Washam's personal knowledge, the officer testified that he had worked in law enforcement for thirty-nine years, working eight years in Ohio, twenty years in Florida, and almost twelve years with the KPD. He stated that based on his experience, it was common for people in low-income communities to share cellular telephones and to be afraid to cooperate with the police. He also gave lengthy explanations for why people shared telephones and did not want to cooperate. Therefore, his knowledge was not based on "mere speculation." Accordingly, we conclude that Investigator Washam's testimony did not violate a clear and unequivocal rule of law. The Appellant is not entitled to plain error relief.

### III. Conclusion

Based upon the record and parties' briefs, we affirm the judgments of the trial court.

_____
NORMA MCGEE OGLE, JUDGE